UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| ERIC L. PEET, | 5:14-CV-05057-KES |
| Plaintiff, | |
| vs. | MEMORANDUM OPINION AND ORDER AFFIRMING THE DECISION OF THE COMMISSIONER |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security; | |
| Defendant. | |

Plaintiff, Eric L. Peet, seeks review of the decision of the Commissioner of the Social Security Administration denying his claim for social security disability insurance benefits (SSDI) under Title II of the Social Security Act, 42 U.S.C. § 423, and for supplemental security income (SSI) under Title XVI of that Act, 42 U.S.C. § 1382. The Commissioner opposes the motion and moves the court to affirm the denial. For the following reasons, the court affirms the decision of the Commissioner.

## PROCEDURAL HISTORY

Peet applied for SSDI and SSI on February 5, 2009, alleging disability since April 12, 2008. AR 259;[1] AR 266.[2] The Social Security Administration

---

[1] All citations to "AR" refer to the appropriate page of the administrative record.

[2] Peet originally filed for disability in 2008, but his claims were denied for failing to submit to a consultative examination. The ALJ agreed to reopen those claims. AR 7.

(SSA) denied Peet's applications initially on June 19, 2009 and again upon reconsideration on November 20, 2009. AR 100-01; AR 103-04. Peet then requested an administrative hearing and appeared with counsel before Administrative Law Judge James W. Olson (ALJ) on October 13, 2010. *See* AR 63-99 (transcript of hearing). Thereafter, the ALJ issued an unfavorable decision finding that Peet retained the residual functional capacity (RFC) to perform past relevant work as a dishwasher and housekeeper. AR 105-23. Thus, the ALJ denied Peet's claims, concluding he was not disabled. Peet timely appealed the ALJ's decision and requested review by the Appeals Council. AR 200. The Appeals Council granted Peet's request and remanded his case to the ALJ in an order dated March 9, 2012. AR 124-27.

On remand, Peet appeared with counsel before the ALJ for a second hearing that was held on June 20, 2012. *See* AR 32-62 (transcript of hearing). Thereafter, the ALJ issued an unfavorable decision finding that Peet could perform past relevant work as a security guard. AR 7-27. The ALJ again denied Peet's claims, concluding that Peet was not disabled. Peet timely appealed the ALJ's decision and requested review by the Appeals Counsel, but such review was denied on July 15, 2014. AR 28-29; AR 1-3.[3] On August 29, 2014, Peet initiated the present action seeking judicial review of the Commissioner's denial of his claims. Docket 1.

---

[3] Because the Appeals Council denied Peet's request for review, the ALJ's decision represents the final decision of the Commissioner for purposes of judicial review. 42 U.S.C. § 405(g).

2

## FACTUAL BACKGROUND

Peet was born on November 26, 1988. AR 259; AR 266. At the time of the second hearing, Peet was 23 years old. AR 38. Peet has experienced significant deafness in both ears all of his life and requires the use of a hearing aid. AR 38; AR 331; AR 358. Peet stated that he can read peoples' lips when they talk, but that he has difficulty hearing and understanding spoken words. AR 39; AR 84. Peet also acknowledged that he has difficulty speaking clearly. AR 39. Peet earned a high school diploma, but did not attend college. AR 38. Peet reported past work experience at a variety of jobs, including work as a security guard, a dishwasher, a car wash attendant, a hotel housekeeper, an auto detailer, and a construction company employee. AR 39-44. Peet primarily worked on a part-time basis and sometimes for a period of only weeks or months before the employment would end. AR 52-54; AR 301-304; AR 333.

Throughout his childhood, Peet was enrolled in special education classes. AR 39. In 2002, when he was thirteen-years-old, Peet began attending classes at the South Dakota School for the Deaf (SDSD) in Sioux Falls, South Dakota. AR 545. While enrolled at SDSD, Peet was the victim of several episodes of sexual abuse instigated by an older male resident of the school named Tom. AR 547.

Following the incidents at SDSD, Peet saw Dr. Curt Hill, a licensed clinical psychologist, for a psychological assessment in 2003. AR 538. Dr. Hill's notes indicate that Peet had not previously attended counseling or been prescribed any medication. AR 538. Dr. Hill further noted that the instances of

3

sexual abuse have negatively impacted Peet's life. AR 539. For example, Peet reported difficulties sleeping, that he no longer wished to attend school, and that he had had several conflicts with family members since the time of the abuse. AR 539. Dr. Hill diagnosed Peet with Post-Traumatic Stress Disorder (PTSD) and assessed Peet's Global Assessment of Functioning (GAF) score at 48.[4] AR 540. Dr. Hill recommended weekly psychotherapy. AR 540.

At some point, Peet filed a civil lawsuit related to the abuse he suffered at SDSD. Dr. Gilbert W. Kliman was retained as an expert to conduct a psychiatric evaluation of Peet. AR 542. Dr. Kliman examined Peet on December 4, 2004, and filed his report on May 22, 2007. AR 542. In addition to interviewing Peet, Dr. Kliman also interviewed Peet's mother and stepfather. AR 542.

Dr. Kliman's report chronicled Peet's upbringing and family background, as well as the instances of abuse that occurred at SDSD and Peet's subsequent transfer from SDSD into public school. AR 543-63. In his interview summaries, Dr. Kliman noted that Peet and his mother reported an increase in verbal and physical conflicts between Peet and members of his family, as well as Peet's tendency to anger quickly. AR 567-70; AR 573; AR 576. Dr. Kliman's report includes his diagnoses of PTSD and depression, and he assessed Peet's GAF

---

[4] The GAF ranks psychological, social, and occupational functioning on a hypothetical continuum of mental illness ranging from zero to 100. A rating of 41–51 indicates serious symptoms or serious impairments. A 51–60 rating indicates moderate symptoms, and a rating of 61–70 indicates mild symptoms. Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32–34 (Text Rev. 4th ed. 2000).

4

score at 55. AR 582. He recommended a long-term therapeutic treatment regime and provided a cost estimate for such a plan. AR 583-586. Peet eventually reached a monetary settlement with SDSD to resolve the lawsuit. *See* AR 50; AR 80. As a result of the settlement, a trust account was established to help Peet pay for counseling. AR 50.

On November 4, 2008, after he moved from South Dakota to stay with his biological father and stepmother in Michigan, Peet began receiving mental health assistance at Pines Behavioral Health Services. AR 473. Darren Moore, a clinician, completed Peet's initial assessment. AR 473. Peet reported that he had been experiencing trouble sleeping and that he was feeling quick tempered. AR 473. Peet was diagnosed with PTSD and a mood disorder not otherwise specified. AR 480. His GAF score at that time was assessed at 53. AR 480. Peet received a recommendation to continue individual therapy in order to address his needs. AR 483.

Peet attended a therapy session at Pines Behavioral Health Services on November 11, 2008, where he identified several personal goals and discussed methods for achieving them. AR 484-91. He was scheduled for another session on November 18, 2008, but was later listed as a no-show. AR 492. Peet returned on December 17, 2008 and reported that he had been spending too much money lately. AR 493. According to Peet, he tended to spend money in order to combat boredom. AR 493. Peet was assisted in finding other activities to occupy his time and encouraged to pursue college. AR 493. On December 30, 2008, he was again listed as a no-show for his therapy session. AR 495.

According to Peet, he returned to South Dakota in early 2009 to live with his mother and did not return to Pines Behavioral Health Services.

On June 1, 2009, after applying for disability benefits, Peet was referred to Dr. Craig Mills for a physical consultation. AR 502. Peet reported back pain and knee discomfort. AR 502. Dr. Mills ordered a series of x-rays. The first, an x-ray of Peet's lumbar spine, showed a mild dextrocurvature of the thoracolumbar spine. AR 499. There were no degenerative disc changes or fractures present. AR 499. Additionally, the x-ray showed no abnormal motion with flexion or extension. AR 499. The second, an x-ray of Peet's thoracic spine, did not show any degenerative abnormalities or factures. AR 500. The third, an x-ray of Peet's right foot, showed no abnormalities. AR 501.

On October 12, 2009, Peet was referred to Dr. Greg Swenson for a psychological consultation. AR 444. Peet reported that he is prone to becoming angry easily, which has manifested itself in the workplace, at times resulting in Peet's loss of employment because he became embroiled in aggressive conflicts with co-workers and supervisors. AR 444. Additionally, Peet explained that he is reminded of his abuser when he is around people of Asian descent. AR 444. Dr. Swenson noted that the combination of Peet's hearing loss and his aggressive tendencies have made it difficult for him to obtain or keep jobs. AR 447. Dr. Swenson diagnosed Peet with Intermittent Explosive Disorder (IED), PTSD, and Dysthymic Disorder, [5] and ruled out diagnoses of ADHD or a

---

[5] Dysthemia "is a mild but long-term (chronic) form of depression." *See* MayoClinic.org, http://www.mayoclinic.org/diseases-

6

learning disorder not otherwise specified. AR 448. Peet's GAF score at that time was assessed at 40. AR 448.

On April 2, 2012, Peet met with Sharon Hansen, a counselor, for an intake assessment. AR 533. Hansen's notes indicate that Peet was a self-referral and that he was encouraged to see her by his attorneys. AR 533. Peet reported changes in his behavior since the incidents of abuse at SDSD, such as his increased irritability, his desire to be isolated from other people, and his lack of ambition. AR 533. Hansen noted Peet's difficulties at work and in keeping employment. AR 533. Peet also reported that he experienced anxiety around people of Asian descent, as they remind him of his abuser. AR 533. Hansen opined that Peet exhibited symptoms of PTSD and depression, and assessed a GAF score of 50. AR 534-35. She recommended weekly therapy. AR 534.

Peet returned to see Hansen on April 4, 2012. AR 536. Her notes describe Peet's dissatisfaction with his court case and his belief that Tom did not face any real consequences for his actions. AR 536. Peet met with Hansen again on April 10, 2012. AR 537. Peet discussed the incidents of abuse that occurred at SDSD and reported that he still experienced trouble sleeping. AR 537. Peet felt, however, that he had made some progress on his anger issues. AR 537. On April 24, 2012, Peet returned to see Hansen for another therapy session. AR 615. Peet discussed looking for jobs in Michigan and his plans to

conditions/dysthymia/basics/definition/con-20033879 (last visited September 17, 2015).

attend his brother's wedding. AR 615. Hansen's notes state that Peet seemed to be more comfortable around others and that he had less anxiety in general. AR 615. According to the record, Peet's last therapy session with Hansen was April 30, 2012. AR 616. Hansen noted that Peet appeared to be more relaxed and that he was sleeping better. AR 616. Peet also had spent some time assisting his family with yard work and had went out to a movie without experiencing anxiety despite the crowd. AR 616. Peet stated he was still concerned about controlling his anger, but that he was looking forward to attending his brother's wedding and felt confident about his ability to cope with the situation. AR 615.

## ALJ DECISION

On July 9, 2012, the ALJ issued a decision denying Peet's application for benefits. AR 4-27. In doing so, the ALJ used the sequential five-step evaluation process.[6] At step one, the ALJ determined that Peet had not engaged in

---

[6] An ALJ must follow " 'the familiar five-step process' " to determine whether an individual is disabled. *Martise v. Astrue*, 641 F.3d 909, 921 (8th Cir. 2011) (quoting *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010)). 20 C.F.R. § 404.1520(a)(4)(i)-(v) provides that "(i) [a]t the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . . (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement of § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . . (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of [subpart P of part 404 of this chapter] and meets the duration requirement, we will find that you are disabled. . . . (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you

8

substantial gainful activity since April 12, 2008. AR 11. At step two, the ALJ

found that Peet was suffering from several severe impairments, namely:

bilateral hearing loss, mild dextrocurvature of the thoracolumbar spine with

pain, dysthymia, PTSD, and IED. AR 11. At step three, the ALJ found that Peet

did not have an impairment or combination of impairments that met or

medically equaled a listed impairment. AR 11-13. At step four, the ALJ found

that Peet had the RFC to perform medium work within certain parameters. AR

13. The ALJ also found that Peet could perform past relevant work as a

security guard. AR 19. Because the ALJ determined that Peet could still

perform past relevant work, the ALJ concluded that Peet was not disabled and

did not qualify for benefits under the Social Security Act.

## STANDARD OF REVIEW

The court must uphold the ALJ's decision if it is supported by

substantial evidence in the record as a whole. 42 U.S.C. § 405(g) ("The findings

of the Commissioner as to any fact, if supported by substantial evidence, shall

be conclusive . . . ."); *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011).

"Substantial evidence is 'less than a preponderance, but is enough that a

reasonable mind would find it adequate to support the Commissioner's

conclusion.' " *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting

---

are not disabled. . . . (v) At the fifth and last step, we consider our assessment
of your residual functional capacity and your age, education, and work
experience to see if you can make an adjustment to other work. If you can
make an adjustment to other work, we will find that you are not disabled. If
you cannot make an adjustment to other work, we will find that you are
disabled."

*Maresh v. Barnhart*, 438 F.3d 897, 898 (8th Cir. 2006)). The court considers evidence that both supports and detracts from the ALJ's decision. *Moore v. Astrue*, 623 F.3d 599, 605 (8th Cir. 2010). If the Commissioner's decision is supported by substantial evidence in the record as a whole, the court may not reverse it merely because substantial evidence also exists in the record that would support a contrary position or because the court would have determined the case differently. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)).

In determining whether the Commissioner's decision is supported by substantial evidence in the record as a whole, the court reviews the entire administrative record and considers six factors: (1) the ALJ's credibility determinations; (2) the claimant's vocational factors; (3) medical evidence from treating and consulting physicians; (4) the claimant's subjective complaints relating to activities and impairments; (5) any third-party corroboration of claimant's impairments; and (6) a vocational expert's testimony based on proper hypothetical questions setting forth the claimant's impairment(s). *Stewart v. Sec'y of Health & Human Servs.*, 957 F.2d 581, 585-86 (8th Cir. 1992) (citing *Cruse v. Bowen*, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The court also reviews the Commissioner's decision to determine if an error of law has been committed, which may be a procedural error, the use of an erroneous legal standard, or an incorrect application of the law. *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (citations omitted). Issues of law are reviewed de novo with deference accorded to the Commissioner's construction

of the Social Security Act. *Id.* (citing *Juszczyk v. Astrue*, 542 F.3d 626, 633 (8th Cir. 2008)).

## DISCUSSION

### I.   Step Four

Before an ALJ moves to step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4). A claimant's RFC "is the most he can still do [in a work setting] despite his limitations." 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). The RFC assessment is an indication of what the claimant can do on a "regular and continuing basis" given the claimant's limitations. 20 C.F.R. §§ 404.1545(b); 416.945(b). " The ALJ should determine a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.' " *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004)). The RFC must include the limitations from all medically determinable impairments, regardless of whether they are considered severe. *See* SSR 96–8p, 1996 WL 374184 at *5 (SSA 1996) ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.' ").

In determining Peet's RFC, the ALJ considered Peet's significant hearing loss, his difficulty communicating with others, the instances of his abuse at SDSD, his complaints of spontaneous anger, his depression, and his complaints of knee and back pain. AR 13-19. The ALJ also reviewed the notes

11

in the record from Peet's therapy sessions and caregivers. AR 14-19. The ALJ

made findings on Peet's credibility and considered the opinions of Peet's mother

and several state agency physicians. AR 15-18. The ALJ ultimately determined

that:

> [T]he claimant has the residual functional capacity to perform
> medium exertional work with postural limitations of occasional
> climbing of ladders/ropes/scaffolds, and frequent climbing of
> ramps/stairs, balancing, stooping, kneeling, crouching, or
> crawling; no manipulative or visual limitations; had limited hearing
> and speaking due to bilateral hearing loss; should avoid
> concentrated exposure to hazards (machinery, heights, etc.); mild
> limitations in his ability to understand, remember, and carry out
> simple instructions and ability to make judgments on complex
> work-related decisions. His limitations were moderate to marked in
> his abilities to interact appropriately with the public, supervisors,
> or co-workers, and ability to respond appropriately to usual work
> situations and to changes in a routine work setting.

AR 13.

### A.      ALJ's Credibility Determination

"[W]hen evaluating a claimant's credibility, in addition to considering the

absence of objective medical evidence to support complaints of pain, an ALJ

should consider a claimant's reported daily activities, the duration, frequency

and intensity of his or her pain, precipitating and aggravating factors,

medication, and functional restrictions." *Steed v. Astrue*, 524 F.3d 872, 875 n.4

(8th Cir. 2008) (citing *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984)); *see* 20

C.F.R. §§ 404.1529(c)(3); 416.929(c)(3). "The ALJ is not required to discuss

methodically each *Polaski* consideration, so long as [the ALJ] acknowledged

and examined those considerations before discounting [Peet's] subjective

complaints." *Steed*, 524 F.3d at 876 (internal quotation omitted). An ALJ must

make express credibility determinations detailing reasons for discounting a claimant's subjective complaints. *Dipple v. Astrue*, 601 F.3d 833, 837 (8th Cir. 2010). An ALJ's credibility determination is entitled to deference because the ALJ is in a better position than a reviewing court to gauge credibility. *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007).

## 1.    Allegations of Mental and Physical Limitations

On February 5, 2009, Peet completed a disability report in conjunction with his application for benefits. AR 323-32. He listed the illnesses and conditions that limited his ability to work as deafness, back pain, and "annoying stomach noises." AR 324. Peet explained that his hearing loss made it especially difficult for him to work, because he would often miss instructions or need to ask people to repeat themselves constantly. AR 324. In a function report completed on March 6, 2009, Peet stated that he did not have any difficulty getting along with family, friends, neighbors, or others. AR 370. He indicated that he got along "good" with authority figures and that he had not been fired or laid off from a job because of problems getting along with other people. AR 371.

During the hearings before the ALJ, Peet recalled several instances before and after filing for benefits where past jobs had ended due to various conflicts that arose between himself and his supervisors or other employees. *See* AR 40-45; AR 74. For example, Peet explained that he had been fired from Sears in 2007 for stealing money and striking a supervisor, that he was fired from a position at Wind Cave in 2010 after he borrowed caving equipment

13

without permission, and that he quit a job working as a security guard after getting into an argument with another employee. AR 41-46; AR 48. While Peet felt he had some physical limitations, he testified that his main problem with being able to find and maintain work opportunities stemmed from the abuse he suffered at SDSD. AR 51-52. More specifically, Peet testified that he now felt angry all the time, that he would have anger outbursts regularly, up to every day or every other day, and that he did not get along with other workers. AR 47-48. Regarding counseling, Peet testified that he had been seeing a counselor but that he was dissatisfied with her methodology and that he had stopped seeing her. AR 49. Peet acknowledged that he had a trust fund to pay for another counselor, but he had been unable to find one because the trust fund did not pay for gas, food, or travel. AR 50.

Peet's mother, Tracy Echie, also testified briefly at the second hearing. AR 55-58. She testified regarding Peet's anger outbursts, noting that they previously occurred daily but now occur roughly twice a week. AR 56-57. Echie also recalled some of Peet's prior jobs, including when he was fired for stealing money and borrowing caving equipment. AR 57-58. She also opined that Peet had difficulty working with others because she and Peet could not do dishes together in the past without getting into an argument. AR 58.

### 2. ALJ's Conclusion

The ALJ found that "[Peet's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these

14

symptoms are not credible[.]" AR 17. The ALJ observed that the objective medical evidence did not support Peet's claim of frequent, uncontrollable anger outbursts. AR 18 (noting Peet's assertions that "he cannot work full time because he does not get along with people are self-serving" and that Peet claimed that he suffers "daily outburst[s] but there is no medical corroboration.") Additionally, the ALJ observed that "[Peet's] asserted limitations of not lifting more than 5 pounds are not documented anywhere in his medical records." AR 18. The ALJ also observed that Peet's activities of daily living were inconsistent with his allegations of frequent, uncontrollable anger outbursts or disabling pain. AR 18-19 (noting that Peet claimed he did not like crowds, but that he "traveled from Hawaii to South Dakota; to Michigan, to Hawaii, and back to South Dakota" since his alleged disability onset without difficulty, and that Peet's hobbies of fixing fences and boxing are "extremely physical and not consistent with his claims of back pain and knee pain."). The ALJ also noted that Peet's mother wrote that he enjoyed playing games, working on cars, and going to the library regularly. AR 18. Regarding medication and treatment of Peet's mental symptoms, the ALJ found that "[u]ntil recently, [Peet] has not undertaken counseling or training to better relate with others or to deal with perceived insults" and that Peet was no longer seeing a therapist. AR 18. For Peet's physical symptoms, the ALJ found that Peet "is not taking any pain medications, prescription or over-the-counter" and that he is not engaged in "exercise programs or physical therapy." AR 18. The ALJ concluded that Peet's allegations were not fully credible.

Peet contends that objective medical evidence supports his allegations of frequent anger outbursts.[7] He points to Dr. Kliman's report which, according to Peet, documents the frequency and severity of his anger outbursts. Additionally, Peet contends that although he was not pursuing treatment at the time of the hearing, he has good reasons for not doing so. The first is that his condition is no longer amenable to treatment, and the second is that he was unable to afford continued treatment.

First, Dr. Kliman's report was compiled in conjunction with Peet's civil lawsuit related to the abuse he suffered at SDSD. Dr. Kliman summarized the interviews he had with Peet and his mother on December 4, 2004, which occurred several years before the alleged onset of Peet's disability. Dr. Kliman incorporated Peet and his mother's statements into the narrative of his report, including their statements that Peet became more irritable after the incidents at SDSD and that they would argue more frequently. Aside from incorporating Peet and his mother's subjective complaints, the report does not include objective medical testing or diagnostic observations that were performed and support what those claims asserted. Thus, while Dr. Kliman's report is medical evidence, it is not "objective medical evidence." *See Rehder v. Apfel*, 205 F.3d 1056, 1060 (8th Cir. 2000); *see also Lake v. Astrue*, 4:11-CV-1615-TIA, 2012 WL 4479129 at *11 (E.D. Mo. 2012) (agreeing with ALJ's decision to discount a medical opinion prepared in response to litigation and which was based on

---

[7] Peet does not contest the ALJ's credibility determination as it pertains to his subjective complaints of physical pain.

16

subjective complaints rather than objective medical testing). Even assuming Dr. Kliman's report serves as objective medical evidence on this point, it does not state that Peet experiences anger outbursts with any particular frequency or severity. In a section entitled "Summary of Current Functioning and Damages Claimed," Dr. Kliman includes Peet's statement that he is easily angered and frustrated " 'over everything,' " and that he fights with brothers frequently. AR 576. In another section, Dr. Kliman notes that Peet was quick to anger when he returned home from SDSD in February 2003. AR 582. In the "Prognosis" section, Dr. Kliman states that Peet has demonstrated aggressive behavior toward others and that he may be at an increased risk to do so in the future. AR 586. Thus, while Dr. Kliman's report includes references that Peet did (in 2004) experience anger outbursts and that he acted aggressively towards members of his family, it does not include any reference to the periodicity or severity at which those events occur. Thus, Dr. Kliman's report does not support Peet's claim that he experiences anger outbursts with the frequency or severity that he described before the ALJ.

Second, Peet's claim that his symptoms are now so intractable that he is no longer amenable to treatment is not supported by any formal diagnosis or by the record as a whole. Peet's sole source for his conclusion comes from Dr. Kliman's report, where Dr. Kliman opined in 2004 that, without therapy, Peet's "symptoms will become increasingly intractable over time." AR 583. Dr. Kliman further opined that Peet could have trouble utilizing therapy and that he would continue to struggle throughout his remaining academic years.

17

AR 586. Dr. Kliman's remarks on the potential effectiveness of therapy and
Peet's symptoms over time are merely speculative, however, and refer only
generally to possibilities that may or may never come to pass. As such, Dr.
Kliman's remarks do not substantiate Peet's claim. *See Stormo v. Barnhart*, 377
F.3d 801, 806 (8th Cir. 2004) (agreeing with the ALJ's decision not to rely on a
speculative medical opinion based on conditions and possibilities). This
conclusion applies with equal force to Peet's personal opinion that his
condition is no longer amenable to treatment. Moreover, regarding the types of
therapy recommended by Dr. Kliman, the providers at Pines Behavioral Health
Services as well as counselor Hansen both offered and recommended continued
therapy to treat Peet's symptoms, and the most recent records from Hansen
show that Peet was experiencing success managing his anger and related
issues. AR 483; AR 537; AR 616 (noting Peet reported managing his anger
better and that he did not experience any anxiety when he went to a movie
despite the crowd of people). Thus, the medical records subsequent to Dr.
Kliman's report contradict Peet's contention that his condition was not
amenable to treatment. *See Moore v. Astrue*, 572 F.3d 520, 525 (8th Cir. 2009)
(explaining that if an impairment can be controlled by medication or treatment,
then it cannot be considered disabling). Finally, there is evidence that Peet
failed to attend several treatment sessions at Pines Behavioral Health Services
and that Peet stopped attending counseling at the time of the second ALJ
hearing. AR 492; AR 495; *see also* AR 49. "A failure to follow a recommended
course of treatment also weighs against a claimant's credibility." *Guilliams v.*

18

*Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) (citing *Gowell v. Apfel*, 242 F.3d 793, 797 (8th Cir. 2001)).

There is some substance to Peet's third claim of error regarding his inability to pay for treatment. The Eighth Circuit has acknowledged that a lack of financial resources can justify a failure to seek treatment or to follow prescribed treatment. *Johnson v. Bowen*, 866 F.2d 274, 275 (8th Cir. 1989). While a lack of such resources merits consideration, it is not determinative. *Murphy v. Sullivan*, 953 F.2d 383, 386 (8th Cir. 1992). Unlike in *Johnson*, in Peet's case there is a trust fund that was established to help pay for his therapy, and Peet has, in fact, received counseling. There is no evidence that Peet was ever denied medical treatment due to a lack of financial resources. *See Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005). Rather, Peet explained that he stopped seeing his then-current counselor and that he is not seeing anyone else because his trust fund does not cover the additional expenses such as gas, food, or travel expenses that he would incur finding a new therapist.[8] Thus, although Peet has funds available to help pay for therapy, he may not have all the funds he would need to receive treatment from the particular therapist he likes.

While it may have been improper for the ALJ to discredit Peet solely on the basis that Peet was not pursuing therapy, the record reveals that the ALJ did not do so. Rather, the ALJ looked at the lack of objective medical evidence,

---

[8] Peet does not explain why he no-showed on two of his sessions at Pines Behavioral Health Services.

Peet's activities of daily living, and the fact that Peet's symptoms showed signs of improvement following treatment but that he later stopped treatment. Other evidence also supports the ALJ's decision. For example, the ALJ noted that Peet only began seeing Hansen shortly before the second administrative hearing, after his case had been remanded, and that he did so at the encouragement of his attorneys. AR 16; *see Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995) (expressing skepticism when a claimant's encounter with caregivers appears linked to a quest to obtain benefits). And while Peet stated that he could not work because he did not get along with others, he also acknowledged to Dr. Swenson that he tended to get tired or bored of a job quickly which would contribute to his short periods of employment. AR 445. The ALJ is permitted to take into consideration any inconsistencies in the claimant's own statements that appear in the record when making a credibility determination. *Chamberlain v. Shalala*, 47 F.3d 1489, 1494 (8th Cir. 1995). In sum, substantial evidence in the record as a whole supports the ALJ's decision that Peet's subjective complaints are not entirely credible.

### B.    Medical Opinion Evidence

Peet contends that the ALJ improperly substituted his own opinion regarding the frequency and severity of Peet's anger outbursts for that of Dr. Robert Pelc, a licensed psychologist and medical expert that testified at both ALJ hearings.[9] In general, an ALJ is forbidden from substituting his or her own

---

[9] Peet makes the assertion that Dr. Pelc apparently did not review Dr. Kliman's report and that the ALJ possibly failed to provide Dr. Kliman's report

opinion for that of a physician. *See, e.g., Finch v. Astrue*, 547 F.3d 933, 938 (8th Cir. 2008); *Pratt v. Sullivan*, 956 F.2d 830, 834 (8th Cir. 1992). But "[t]he ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001) (citation omitted). The court reviews the ALJ's treatment of medical opinion evidence under the substantial evidence rubric. *Renstrom v. Astrue,* 680 F.3d 1057, 1065 (8th Cir. 2012).

At the first hearing, Dr. Pelc opined about certain limitations Peet possessed. AR 67. As to Peet's anger outbursts, Dr. Pelc noted that the medical records "really [don't] give a frequency" and that "the frequency is sometimes random and can be either more sparse or more frequent, but it has to be something other than an isolated incident or a couple of isolated incidents to warrant" Peet's IED diagnosis. AR 69. Dr. Pelc explained that he believed Peet had moderate limitations on social functioning "in the main." AR 68. But "on a sustained basis, one would expect that [there] would be interferences at a marked level because of [Peet's] angry outbursts." AR 68.

At the second hearing, Dr. Pelc again testified that "there is no

---

to Pelc. *See* Docket 16 at 26 n.10; *id.* at 32 n.13. Dr. Kliman's report is listed as exhibit 20F in the administrative record. It is specifically mentioned in the list of exhibits attached to the ALJ's decision that is the subject of this court's review (AR 26), and Dr. Pelc testified at the second hearing that he reviewed all exhibits "through 22F," thus including Dr. Kliman's report. AR 33 (also acknowledging the receipt of two more exhibits the morning of the hearing). While Dr. Pelc may not have relied on Dr. Kliman's report, that does not mean he did not review it.

description in this record around how frequently [the outbursts] happen, to what extent that they are regularly occurring. They are simply noted to be part of his history, and when those events are happening." AR 35. He observed, however, that Peet's latest counseling records indicated some improvement in Peet's ability to control his anger and that Peet was engaged in more socializing. AR 35. Regarding Peet's social functioning, Dr. Pelc opined that Peet "would be at a marked level of limit[ation] when he is having one of these angry outbursts." AR 35. But, "absent those [outbursts], he would not be impaired socially." AR 35.

Peet reads Dr. Pelc's opinion at the first hearing as standing for the proposition that Peet would have sustained, marked limitations on his ability to function socially due to his anger outbursts. Thus, Peet contends that the ALJ's inclusion of "moderate to marked," rather than simply marked limitations in Peet's RFC, was error.

First, it is not clear that the ALJ relied on Dr. Pelc's testimony from the first hearing in light of Dr. Pelc's more current testimony at the second hearing. Second, and irrespective of Dr. Pelc's testimony at the first hearing, his testimony at the second hearing is clear that in the absence of one of Peet's outbursts, Peet would not have marked limitations on his ability to function socially. And before providing that portion of his opinion, Dr. Pelc observed that Peet's medical records from his time with counselor Hansen showed "that he was engaged in more socializing, planning to attend a wedding where apparently he was appearing more relaxed. He was not experiencing panic

22

related symptoms or anxiety exacerbation." AR 35. Those records did not exist

at the time of the first hearing. Finally, a fair reading of Dr. Pelc's testimony at

the first hearing is that he was trying to account for the lack of medical

evidence documenting the periodicity of Peet's outbursts. When a claimant

such as Peet has an episodically occurring impairment, the ALJ should be

mindful of the frequency and duration of its manifestations, as well as periods

of remission. *Tate v. Apfel,* 167 F.3d 1191, 1196-97 (8th Cir. 1999) (noting

periodic seizures and headaches can be diabling); *see also Wilcox v. Sullivan,*

917 F.2d 272, 277 (6th Cir. 1990). As Dr. Pelc explained at both hearings, Peet

did not have marked limitations on his social functioning abilities because

there was a possibility that he may experience an anger outburst at some

unknown time. Rather, his baseline social functioning limitations were

moderate and only became marked when such an outburst occurred. He was

not, however, able to testify how often those outbursts would occur because

none of Peet's caregivers had ever documented such a finding. [10] In addition to

Dr. Pelc's testimony that Peet's limitations would range from the moderate to

---

[10] Aside from mentioning Peet's reports of incidents at work and home, none of Peet's medical care providers have issued an opinion on his ability to work. Dr. Swenson's consultative examination mentions that Peet's mood was pleasant, although Peet reported it was subject to fluctuation. AR 448. Dr. George Richards, a state agency physician, completed a mental RFC in 2009. AR 440-43. As relevant here, Dr. Richards' report opined that Peet was moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors and his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. AR 441. Although not specifically addressing Peet's ability to work, Peet's mother testified briefly at the second ALJ hearing where she stated that Peet used to have daily anger outbursts at home although more recently "it's like maybe twice a week." AR 57.

marked level, Dr. Pelc completed two medical source statements wherein he similarly noted that Peet would have moderate to marked limitations in his abilities to function socially. AR 525; AR 613. Thus, the ALJ's formulation of Peet's RFC as including moderate to marked limitations on his social functioning abilities was consistent with Dr. Pelc's opinion. Therefore, the ALJ did not substitute his own opinion for that of Dr. Pelc's.

### C.    Past Relevant Work

Step four requires the ALJ to determine if the disability claimant can perform his or her past relevant work. It is the claimant's burden to prove he or she cannot perform past relevant work, and the court will uphold the ALJ's determination if it is supported by substantial evidence. *Hill v. Colvin*, 753 F.3d 798, 800 (8th Cir. 2014). Past relevant work is defined as "work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. §§ 404.1560(b); 416.960(b). Under this definition, past relevant work includes both the demands of a claimant's actual previous job as the claimant performed it as well as the job duties of the occupation as generally required by employers throughout the national economy. *Wagner v. Astrue*, 499 F.3d 842, 853 (8th Cir. 2007) (quoting *Jones v. Chater*, 86 F.3d 823, 826 (8th Cir. 1996)). The ALJ should compare the claimant's RFC with the physical and mental demands of the claimant's past relevant work in order to determine if the claimant can perform his or her past relevant work. *Pfitzner v. Apfel*, 169 F.3d 566, 569 (8th Cir. 1999). Additionally, the ALJ may elicit the testimony of a vocational expert

24

in order to determine if a claimant can perform past relevant work. *Wagner*, 499 F.3d at 853. Finally, the ALJ should make explicit findings on this issue. *Kirby v. Sullivan*, 923 F.2d 1323, 1326 (8th Cir. 1991).

### 1.   ALJ Hearing

At the end of the second hearing, the ALJ elicited the testimony of Jerry Grevat, a vocational expert (VE). AR 58. The ALJ inquired about Peet's past job as a security guard. AR 59. The ALJ asked the VE to consider a younger individual with a high school education and with Peet's physical limitations. AR 59. The ALJ instructed the VE to assume the hypothetical individual could understand, remember, and carry out two to three-step instructions and that he could interact socially on an occasional to frequent basis. AR 60. Under that hypothetical, the VE testified that the individual could perform the security guard position. AR 60. When the ALJ asked if it would make a difference that the individual could not communicate well on the phone but could hear conversations and read lips, the VE responded that it would not. AR 60.

The ALJ then asked the VE to consider the addition of anger outbursts, which the ALJ defined as yelling. AR 60. The ALJ asked how many outbursts an employer would tolerate before termination. AR 60. The VE responded that it could be more than two or three such episodes within a one to two week period, although employers may not tolerate it at all. AR 61. The VE stated that no employer would tolerate an employee physically striking a supervisor. AR 61.

### 2.   ALJ Decision

The ALJ noted that the VE prepared a written report concerning Peet's past employment according to the Dictionary of Occupational Titles. AR 19. The ALJ found that the security guard position was at the light exertional level and that Peet had performed it long enough to constitute substantial gainful activity. AR 19. The ALJ recalled the VE's testimony, including the testimony concerning anger outbursts, and concluded that Peet could still perform past relevant work as a security guard. AR 20.

Here, Peet argues that the ALJ's hypothetical question to the VE did not contain the appropriate social limitations discussed by Dr. Pelc. Specifically, Peet asserts that Dr. Pelc testified Peet would have marked limitations on his ability to function socially.

The court has already determined that Dr. Pelc did not testify in the manner Peet suggests. Dr. Pelc did not opine that Peet had marked limitations on his ability to function socially because there was a chance that Peet may have an anger outburst at some time. Rather, Dr. Pelc testified that Peet had only moderate limits on his ability to function socially, but if Peet did experience an anger outburst, then the outburst would raise him to the marked level while it occurred. Neither the ALJ nor the VE were required to assume that Peet's ability to function socially would always be at the marked level when the evidence in the record did not support such a conclusion.

Moreover, other evidence in the record supports the ALJ's determination that Peet could perform past relevant work as a security guard. For example,

the VE noted that the security guard position typically involved being alone forty to fifty percent of the time. AR 60. While Peet would not be alone all the time, such a position would accommodate Peet's desire to work by himself. Additionally, the VE took account of Peet's hearing loss and his inability to speak on the telephone. AR 60. The ALJ also observed the security guard position was at the light exertional level, which was within the medium level the ALJ found Peet capable of performing. The ALJ determined that Peet had not met his burden of showing that he could not perform his past relevant work, and substantial evidence supports the ALJ's decision.

## CONCLUSION

Substantial evidence supports the ALJ's assessment of Peet's RFC. The ALJ did not substitute his opinion for that of Dr. Pelc. Additionally, substantial evidence supports the ALJ's determination that Peet could perform his past relevant work. Accordingly, it is

ORDERED that the decision of the Commissioner is affirmed.

Dated September 28, 2015.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

27